**JESSICA J. OLIVA**
California State Bar No. 312435
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
Jessica_Oliva@fd.org

Attorney for Mr. Israel Ramirez-Quezada

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ISRAEL RAMIREZ-QUEZADA,<br><br>Defendant. | CASE NO.:   21-CR-03433-JLS<br><br>Hon. Janis L. Sammartino<br>Courtroom 4D<br>Date: July 21, 2022<br>Time: 9:00 a.m.<br><br>**MR. RAMIREZ-QUEZADA'S SENTENCING MEMORANDUM** |
|---|---|

## I.     Introduction

Mr. Ramirez-Quezada's arrest in this case was a wake-up call. His life had again spiraled out of control due to addiction. His lifelong battle with substance abuse began when he was a teenager, but in 2019, he had finally graduated from a residential treatment program that changed his life. Unfortunately, once the pandemic hit, Mr. Ramirez-Quezada relapsed after over three years of sobriety. Struggling with isolation from his family and the programs that helped him stay on track, Mr. Ramirez-Quezada found himself again at rock bottom, making poor choices that resulted in his arrest.

Mr. Ramirez-Quezada will have been sober in federal custody for 8 months and 3 days at his sentencing date. He recognizes that this is a crucial opportunity for him to turn his life around. He has been accepted back into the same residential treatment program that helped him first get sober and he is eager to return there upon his release to get his life back on track. For these reasons, and the reasons detailed below, Mr.

Ramirez-Quezada respectfully requests a sentence of time served, coupled with a condition that he complete a long-term residential drug treatment program.

## II. Israel Ramirez-Quezada

### A. Background

Mr. Ramirez-Quezada grew up in Brawley, California with his parents, two sisters, and brother. During his childhood, his father struggled with alcoholism and would become physically abusive. When Mr. Ramirez-Quezada was about nine years old, his father stabbed his mother during one of their fights. After that, his mom moved him and his siblings with her to Texas to live with her family. Two years later, his mom decided to move the family back to California because her husband promised he would not hit her again. Unfortunately, this was short lived change.

At the age of 11, Mr. Ramirez-Quezada deeply struggled with his mother's decision to leave his father for good. Despite the abuse, his father provided some structure and discipline in his life. Mr. Ramirez-Quezada wanted them to remain together and tried to convince his mom to stay with his dad once he got sober, but it was too late. After the separation, his father was upset and no longer wanted to spend as much time with his children. Mr. Ramirez-Quezada and his siblings lived full-time with their mother. She worked long hours to financially support the family and struggled to control the kids as they got older.

With limited supervision, Mr. Ramirez-Quezada began to fall in with the wrong crowd. As a teenager, he started following in the footsteps of his older brother and hanging out with older men in the neighborhood who had been incarcerated and were involved with drugs. At seventeen, Mr. Ramirez-Quezada began experimenting with methamphetamine and started to get in trouble with law enforcement himself. At twenty-one, Mr. Ramirez-Quezada started using heroin.

Mr. Ramirez-Quezada's life was ruled by addiction from his teenage years into his late thirties. He describes getting out of juvenile hall on his eighteenth birthday and trying to get on the right path: attending AA meetings with his father, getting a job,

and starting to save money. Unfortunately, however, he was already addicted to drugs. Throughout his early adulthood, he would have brief periods where he began to make progress and held down a job. But these periods were punctuated by relapse, which would result in poor decisions and further contact with the criminal legal system. He liked working and would do well for a few months in a new job, but would then fall back into the same destructive patterns fueled by drug abuse. During this time, he met his former partner with whom he had four children: Nathan (age 13), Isiah (age 11), Lexi (age 8), and Lizette (age 5). His relationship with his partner during these years was tumultuous, often coinciding with drug use and jealousy about other relationships.

Mr. Ramirez-Quezada had never experienced long-term stability in his life until he achieved sobriety. From February 2017 to June 2018, he completed a residential treatment program at New Creations Men's Home in El Centro. When he graduated, he was hopeful to make things work with his former partner, but when things did not work out, he started drinking again. He recognized this was a slippery slope for him and reached out to his friend who worked at New Creations, Brian Melvin, for help. Mr. Melvin referred him to Teen Challenge of Southern California in Riverside. Teen Challenge was an extremely positive experience for Mr. Ramirez-Quezada. The program helped him forge meaningful relationships, find religion, and gave him the tools to maintain his sobriety. He describes it as the best year of his life.



When he graduated from Teen Challenge in September 2019, Mr. Ramirez-Quezada was thriving on new routines. He went to church every Sunday and

attended bible studies, prayer meetings, and support groups. He was going to the gym daily and holding down steady full-time jobs where he learned new skills. He was also seeing his children on a regular basis and had established a healthier co-parenting relationship with his former partner. He was bonding with his kids on a new level.

Unfortunately, in March 2020, the pandemic hit. All of the routines that had kept Mr. Ramirez-Quezada sober and healthy were no longer possible. The support groups, gym, and church that he went to all shut down. His former partner would not allow him to see the kids because she was worried about the spread of COVID-19.

Isolated from his family, addiction again began to take over his life. Mr. Ramirez-Quezada made the poor decision to begin drinking again—one he now deeply regrets. He thought he could handle a beer on the weekend to help him cope, but he eventually was drinking harder liquor and could not control his urges to drink. One day, when he was very drunk, a neighbor offered him methamphetamine and he smoked it without thinking. Though he tried to resist old patterns and reached out to Mr. Melvin at New Creations who previously helped him, Mr. Ramirez-Quezada was ultimately unable to stop using. He soon lost his job as a forklift driver, for which he had gotten certified.

After losing his job, Mr. Ramirez-Quezada left his apartment and came back to Brawley where he stayed with old friends. He was using methamphetamine and fentanyl regularly. At the time of Mr. Ramirez-Quezada's arrest, his unemployment payments had just run out and he was on the precipice of losing his car due to delinquent car payments. He was isolated from his family, was sleeping at a friend's house without electricity, and was in the grip of his addiction.

**B.   The Future**

Mr. Ramirez-Quezada has now been in custody for over eight months and feels great remorse for his actions. He feels like he finally understands the adage of being "older and wiser," and is saddened when he reflects on the many years that he made poor decisions without regard for their consequences. He now feels these

consequences greatly as he enters his mid-forties. Mr. Ramirez-Quezada has lost many friends due to drug use and he knows that he is "one of the lucky ones" who is instead incarcerated with an opportunity to turn his life around. These past eight months in custody have prompted serious reflection to change his old ways.

Mr. Ramirez-Quezada is eager to return to where he was prior to his relapse: sober, working hard, seeing his kids, and living in his own apartment. He knows it will take significant work to achieve that level of independence and stability again. He hopes to return to the New Creations, the residential program which helped him achieve sobriety in the first place. They have accepted him into the program and he has enthusiastically agreed to spend one year there. *See* Ex. A, New Creations Letter of Acceptance; *see* Ex. B., Release Plan. Though he knows that different "triggers" will come his way in the future, Mr. Ramirez-Quezada feels equipped to face them. He wants to continue to gain skills and pursue his GED at New Creations so that he can find even better opportunities. He knows he is happiest when he is working hard. As Mr. Melvin of New Creations describes in his letter of support: "We helped Israel get a full-time job and his boss told me Israel was the hardest worker he has ever seen." *See* Ex. C, Brian Melvin's Letter of Support.

Mr. Ramirez-Quezada has significant family support in the Imperial Valley to help him stay on track. His younger sister, Eva, has always been there for him and has encouraged him to return to residential treatment. She writes in her letter of support: "My brother is all for going back to where he fell in love with Jesus and restoring his life back." *See* Ex. D, Eva Quezada's Letter of Support. His mother similarly has been a big source of support in his life and is there to help him to turn his life around. *See* Ex. E, Lucy Ramirez Letter of Support. His dad has been sober for about thirty years and also serves as a positive influence to Mr. Ramirez-Quezada to stay clean and to be present for his children. Mr. Ramirez-Quezada wants more than anything to return to the level of closeness he had with his children prior to the pandemic and to maintain a healthy co-parenting relationship with their mother. With the support of New

Creations, he is confident he can get back on his feet.

### III.    The Guidelines Support the Requested Sentence

In this case, Mr. Ramirez-Quezada requests the following Guidelines calculations:

| | |
|---|---:|
| Base Offense Level [§ 2L1.1(a)(3)] | 12 |
| Number of Undocumented Individuals | +3 |
| Minor Role [§ 3B1.2(b)] | -2 |
| Acceptance of Responsibility [§ 3E1.1(a)] | -2 |
| Fast Track [§ 5K3.1] | -2 |
| Combination of Circumstances [§ 5K3.1] | -2 |
| Total Offense Level | 7 |

At a Criminal History Category VI, his resulting Guideline range is 15-21 months. Mr. Ramirez-Quezada has already served 8 months and 3 days. Mr. Ramirez-Quezada asks the Court to allow him to complete his sentence with 12 months in a residential treatment program at New Creations. These conditions would represent time, effort, and sacrifice by Mr. Ramirez-Quezada, and would address both rehabilitative and deterrence purposes.

### A.    This Court Should Not Apply Substantial Risk under USSG § 2L1.1(b)(6).

The PSR and Government recommend an increase pursuant to USSG § 2L1.1(b)(6). The PSR justifies this enhancement by stating: "In the instant offense, Ramirez transported 11 adult [material witnesses ("MWs")] inside a Dodge minivan rated with a seating capacity for 7 adults. Further, some of the MWs reported that they did not have seatbelts to use, and the arresting agent reported that MWs were "stacked" on each other when the minivan stopped. Transporting substantially more passengers than the rated capacity of a motor vehicle is specifically listed in the guidelines as an example of when this increase applies. USSG § 2L1.1(b)(6), comment (n.3)."

As an initial matter, there are factual details that warrant clarification. While the

material witnesses stated that they sat in the backseat without seatbelts on, they did not say that there were no seatbelts available to them. The language is ambiguous as to how exactly the material witnesses were seated in the van.

An increase under 2L1.1(b)(6) should not be applied because Mr. Ramirez-Quezada did not "intentionally or recklessly create a substantial risk of death or serious bodily injury to another person." USSG § 2L1.1(b)(6). There is nothing in the record to suggest that Mr. Ramirez-Quezada intentionally placed material witnesses at risk. To the contrary, the arresting agent reported that Mr. Ramirez-Quezada thought he was only going to be driving two or three people, which would have been well below the minivan's rated capacity. Alternatively, a finding of recklessness under 2L1.1(b)(6) would require that Mr. Ramirez-Quezada "was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation." *United States v. Rodriguez-Cruz*, 255 F.3d 1054, 1059 (9th Cir. 2001). It cannot be said that Mr. Ramirez-Quezada's conduct meets this standard.

First, the government has not satisfied their burden to prove that Mr. Ramirez-Quezada was *aware of the risk* created by his conduct. In *United States v. Castellanos*, 803 Fed. Appx. 90 (9th Cir. 2020), the defendant's admissions in his plea agreement that he drove "fast and recklessly" with two people in the trunk that were unable to free themselves, along with his commitment to recommend a 2L1.1(b)(6) adjustment, were insufficient to prove his awareness of the risk. *Id.*, at 92. In this case, there is even less in the record to indicate Mr. Ramirez-Quezada was "subjectively aware of the danger" at the time of transport. *See id.*, at 92 n.1. There is nothing in Mr. Ramirez-Quezada's plea agreement that indicates he was aware that he was putting anyone at risk of death or serious injury through his conduct.

Even if the requisite mental state were established—which it has not been—it would be unreasonable to categorize Mr. Ramirez-Quezada's conduct as "a gross deviation from the standard of care that a reasonable person would exercise in such a

situation." *Rodriguez-Cruz*, 255 F.3d at 1059. The PSR correctly notes that the guidelines include "carrying substantially more passengers than the rated capacity" as an example of the conduct that could warrant an adjustment. USSG § 2L1.1(b)(6), comment (n.3). However, the Court still must conduct a "fact-specific inquiry" to evaluate the risk in its totality, particularly in the absence of a clear metric for what constitutes "substantially more passengers." *See United States v. Thorpe*, No. 98-50017, 1998 U.S. App. LEXIS 26210 (9th Cir. 1998) (citing *United States v. Young*, 33 F.3d 31, 33 (9th Cir. 1994)).

The Ninth Circuit has explained that examples provided in the 2L1.1(b)(6) application notes, such as driving substantially more passengers than the rated capacity of a vehicle, meet the level of risk required because "the means of travel either exacerbates the likelihood of an accident, subjects the passenger to a risk of injury even during an accident-free ride, or both." *United States v. Torres-Flores*, 502 F.3d 885, 890 (9th Cir. 2007). Where, as here, neither is applicable, the substantial risk enhancement should not apply.

There is no evidence that the additional passengers in the van exacerbated the likelihood of an accident. There is no indication that the vehicle was "severely overloaded" to the point that Mr. Ramirez-Quezada' ability to handle the van was impaired due to the additional passengers. *Id.* at 890 n.8 (noting that "severely overloading a vehicle is likely to make it more difficult to handle, thereby increasing the likelihood of an accident").

There is similarly no indication that the overcrowding subjected the passengers to a heightened risk of injury even during an accident-free ride. There is no evidence of limited oxygen availability or extreme temperatures in the van, nor is there any allegation that the material witnesses could not communicate with the driver or easily extricate themselves from the vehicle if needed. *See United States v. Castelo-Palma*, 30 F.4th 284 (5th Cir. 2022) (noting that non-substantial overcrowding and lack of seatbelts alone is not enough to justify application of 2L1.1(b)(6) in absence of these

additional factors).

Additionally, the government has not demonstrated any unsafe seating configurations apart from a lack of seatbelts. While the exact configuration of the passengers in the van is unknown, three material witnesses stated that they were seated in the backseat. It is possible that two additional material witnesses were seated in the hatchback—which would not create substantial risk pursuant to *Dixon*—and that three of the six seats in the van were then shared. *See United States v. Dixon*, 201 F.3d 1223 (9th Cir. 2001). It is hard to imagine that sharing three seats would create more risk than the conduct in *Torres-Flores*, in which substantial risk was not found where an individual was stowed in a hidden compartment behind the back seat of a pick-up truck. *Torres-Flores*, 502 F.3d at 889. Furthermore, there is no evidence that material witnesses were in a precarious position on the floor or without seats. *Cf. United States v. Ramirez-Martinez*, 273 F.3d 903 (9th Cir. 2001) (finding substantial risk where over twenty passengers were transported in a van in poor condition with no seats); *United States v. Beltran-Garcia*, 2000 U.S. App. LEXIS 18788 (9th Cir. 2000) (finding substantial risk where there were fourteen passengers in a vehicle rated for five and ten were lying on the floor). Sharing seats and the lack of seatbelts alone simply does not create a risk "significantly greater than the risks normally borne by ordinary passengers during normal vehicular travel." *Torres-Flores*, 502 F.3d at 891.

The short distance driven also reduces any risk that would result from these circumstances. Mr. Ramirez-Quezada drove for *less than 45 seconds. Cf. United States v. Hernandez-Guardado*, 228 F.3d 1017 (9th 2000) (finding substantial risk where vehicle was over capacity in multiple long-distance trips with individuals lying unrestrained on floorboards and across seats). He immediately pulled to the side of the road upon seeing the Border Patrol vehicle. *Cf. United States v. Luna*, No. 97-50511, 1998 U.S. App. LEXIS 12850 (9th Cir. 1998) (finding substantial risk in part due to flight from Border Patrol which resulted in tires being blown out by puncturing device). The likelihood of an accident under these circumstances was extremely unlikely.

In sum, Mr. Ramirez-Quezada did not treat his passengers as "mere cargo." *United States v. Torres-Lopez*, 13 F.3d 1308 (9th Cir. 1994). The only risk, at most, that he subjected the material witnesses to was sharing seats without enough seatbelts. There is no evidence to suggest that the five additional passengers above the van's rated capacity created a greater likelihood of accident during the short drive or that it subjected passengers to a risk of injury even during an accident-free ride. *United States v. Torres-Flores*, 502 F.3d 885, 890 (9th Cir 2007). As in *Torres-Flores*, "there was some additional risk, but only in the highly unlikely event of an accident" *United States v. Torres-Flores*, 502 F.3d 885 (9th Cir 2007). Under these circumstances, the substantial risk enhancement cannot apply.

### B. This Court Should Grant Minor Role under USSG § 3B1.2(b).

Based on the information available, specifically the facts outlined in the PSR, the Court should conclude that Mr. Ramirez-Quezada played a minor role in the offense. Mr. Ramirez-Quezada had no knowledge of the broader plan. The day before the instant offense, Mr. Ramirez-Quezada received a phone call from an old friend who asked if he wanted to make easy money. The friend told him that they would provide a car to drive to Calexico and he would receive a phone call once he arrived there with further instructions. The next day, a car was left nearby his residence with keys under the mat. Mr. Ramirez-Quezada drove to Calexico, and once there, he received a phone call from a different man directing him to get on the highway. The man instructed Mr. Ramirez-Quezada on where and when he was approaching the group of people that he was supposed to pick up. After Mr. Ramirez-Quezada picked up the group of people, he was immediately pulled over and arrested. He had not yet received instructions about where he was supposed to take them. None of the material witnesses indicated that they had corresponded with Mr. Ramirez-Quezada previously. They each had made arrangements with smugglers in Mexico. These facts support that there were at least three other participants with more substantial culpability than Mr. Ramirez-Quezada.

In order to receive a minor role adjustment, the defendant must show by a preponderance of the evidence that he is less culpable than most other participants. USSG § 3B1.2 app. n.5; *United States v. Davis*, 36 F.3d 1424, 1436 (9th Cir. 1994). Notably, a minor role reduction is available to individuals convicted of § 1324 smuggling offenses. See *United States v. Flores-Mendoza*, No. 00-50083-W, 2000 U.S. App. LEXIS 30212 (9th Cir. Nov. 27, 2000) (unpublished).

In making its determination, the Court must evaluate the defendant's role "relative to all participants in the criminal scheme for which he is charged." *United States v. Rojas-Millan*, 234 F.3d 464, 473 (9th Cir. 2000). This means that the Court cannot ignore the actions of other uncharged participants, but must instead consider the culpability of the defendant "relative to the involvement of other likely actors.". See *id.* at 473-74.

In this case, Mr. Ramirez-Quezada played no part in organizing the offense, did not have any knowledge of the broader plan, and did not set up payment from the material witnesses. He did not know how many people he would be transporting, where he would be taking them, or the amount they would be paying to be smuggled into the United States. He only knew to arrive somewhere at a particular time and to follow instructions. He did not even know who was instructing him. Accordingly, a two-level decrease in Mr. Ramirez-Quezada's offense level is appropriate.

**IV.   The 3553(a) Factors Support the Requested Sentence**

As this Court knows, it has considerable discretion in choosing an appropriate sentence for Mr. Ramirez-Quezada. Here, a sentence of time served in custody with a condition that he complete 12 months in the New Creations residential program is the appropriate sentence for Mr. Ramirez-Quezada who more than anything needs treatment for his addiction. Mr. Ramirez-Quezada's actions were driven by his substance abuse and financial desperation. As a result, he regrettably agreed to help transport undocumented individuals from one location to another. Mr. Ramirez-Quezada has taken complete responsibility for his role in the offense. He is remorseful

for what he is done and wants to get back on the path he was on prior to the pandemic.

As discussed in detail above, Mr. Ramirez-Quezada's history and characteristics are mitigating. He grew up in a household impacted by substance abuse and domestic violence. He has family support, goals, and an opportunity to enroll in a residential treatment program that will help him prepare for success. Mr. Ramirez-Quezada is devoted to rehabilitating himself and being sober once and for all.

Here, the goal of general deterrence is best achieved by arrest itself, rather than additional time in prison. Indeed, the Department of Justice's National Institute of Justice has recognized that the certainty of being caught is by far more effective than time in prison at deterring crime. See Five Things About Deterrence, DEP'T OF J., NAT'L INST. OF J., http://nij.gov/five-things/pages/deterrence.aspx (last modified June 6, 2016). In Mr. Ramirez-Quezadas' case, the goal of specific deterrence is best served by community supervision where he will be supported with housing, employment, and treatment. A longer prison sentence could actually impede the goals of sentencing, stifling his motivation to rehabilitate himself at such an important point in his life.

//

//

//

//

//

//

MR. RAMIREZ-QUEZADA'S SENTENCING MEMORANDUM

## V. Conclusion

Mr. Ramirez-Quezada has reached a point in his life where he knows that enough is enough. He made poor, ill-conceived decisions fueled by a severe relapse and is deeply remorseful for the mistakes he has made. With significant family and programmatic support behind him, Mr. Ramirez-Quezada knows that he is capable of achieving sobriety. He respectfully requests that the Court sentence him to time served, coupled with a condition that he complete a 12-month residential treatment program at New Creations. This is the sufficient, but not greater than necessary sentence in this case.

Respectfully submitted,

Dated: July 15, 2022

*s/ Jessica J. Oliva*
Federal Defenders of San Diego, Inc.
Attorney for Mr. Israel Ramirez-Quezada
Email: Jessica_Oliva@fd.org